IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

```
FARM & RANCH SERVICES, LTD.,    )
A Texas Limited Partnership,    )
                                )    NO. 4:08-cv-00239-RAW
        Plaintiff/Counter-claim )
        Defendant,              )
                                )
THE TEXAS INDEPENDENT           )
BANKERSBANK,                    )
                                )    FINDINGS OF FACT,
        Intervenor,             )    CONCLUSIONS OF LAW
                                )    AND ORDER FOR JUDGMENT
vs.                             )
                                )
LT FARM & RANCH, LLC, and       )
TOM VILSACK, SECRETARY,         )
U.S. DEPT. OF AGRICULTURE, and  )
TIMOTHY ALLEN LEE,              )
                                )
        Defendants,             )
                                )
and                             )
                                )
LT FARM & RANCH, LLC,           )
                                )
        Counterclaim plaintiff. )
```

This action began when plaintiff Farm & Ranch Services,

Ltd. ("Farm & Ranch"), filed a Complaint in the United States

District Court for the Northern District of Texas. It alleged that

defendants LT Farm & Ranch, L.L.C. ("LT") and Bruce Tripp, Jr. and

Timothy Allen Lee,[1] its co-managers and members, failed to make

payments on contracts which sold and assigned LT's rights to

payments from the United States Department of Agriculture ("USDA")

---

[1] Default has been entered against defendant Lee and judgment
on default will be entered as a part of this ruling. Defendant
Tripp was dismissed in the Court's October 18, 2010 ruling on
defendants' motion for partial summary judgment [111].

on two Iowa farms owned by LT and enrolled in the Conservation Reserve Program (CRP). The original contracts were with the now-defunct First National Bank of O'Donnell, Texas ("the O'Donnell bank"). Farm & Ranch had purchased the contracts from the O'Donnell bank's successor, the State National Bank of Big Spring, Texas ("the Big Spring bank").

In its Complaint Farm & Ranch asserted damages claims against the private defendants for breach of contract, quantum meruit, fraud, tortious interference with contract, and promissory estoppel. It sought a declaratory judgment against all defendants that it was entitled to disputed CRP payments being held by the USDA[2] and asked the Court to order the Secretary of Agriculture to pay the withheld CRP money. In its answer to the Complaint, the Secretary raised as an affirmative defense, among others, plaintiff's lack of rights under the CRP assignments which by their terms do not extend to any successor or assignee of the original assignee. Defendants LT and Tripp[3] filed a motion in the Texas court to dismiss for improper forum or lack of personal jurisdiction, and an alternative motion to transfer. The Texas

---

[2] The Secretary of Agriculture is a party to this suit solely because the USDA has suspended CRP payments pending resolution of the issue concerning who has the right to receive them. Since the lawsuit was filed, Tom Vilsack has become the Secretary of the USDA and has been substituted as a party pursuant to Fed. R. Civ. 25(d).

[3] The Texas court entered default against defendant Timothy Allen Lee, leaving determination of damages for resolution in this district. (11/20/08 Ruling [35-8] at 26 n.13).

court found it lacked personal jurisdiction over defendants, but agreed venue was proper in Iowa and elected not to dismiss. The case was transferred to this district on November 25, 2008. (11/20/08 Ruling [35-8] at 26).

Upon arrival of the case in this district LT answered and filed a counterclaim[4] against Farm & Ranch seeking a determination that the contracts were void and unenforceable as entered into without authority, restitution of the CRP money paid to the O'Donnell bank under the contracts and, alternatively, rescission of the contracts. The restitution claim has been abandoned. (*See* Final Pretrial Order [116] at 9).

On April 29, 2009 Farm & Ranch filed a Motion for Default Judgment [43] against defendant Lee. The Clerk of this Court entered default against Mr. Lee on April 30, 2009 [45].

In December 2009, Farm & Ranch assigned its rights in the contracts in dispute and its claims in this litigation to The Texas Independent Bankersbank ("TIB"). TIB has been allowed to intervene as a party-plaintiff and filed its complaint in intervention asserting the same claims as Farm & Ranch. Farm & Ranch and TIB are jointly represented. At trial, they agreed any judgment in favor of plaintiffs should be in favor of TIB alone. The Court considers TIB

---

[4] Defendants LT and Tripp also brought a cross-claim against the USDA on various theories of recovery. The cross-claim was dismissed on July 16, 2010 [104].

the real party in interest on the claims originally brought by Farm & Ranch.

The Court has diversity jurisdiction, 28 U.S.C. § 1332, of the claims between the private parties. The USDA has denied federal question and federal defendant jurisdiction, but has been content to participate as a stakeholder. *See* 28 U.S.C. § 1332, 1346(a)(1) [Gov't Ans. [35-6] ¶ 7]. The case is before me pursuant to 28 U.S.C. § 636(c). The case came on for bench trial on November 15 and 16, 2010 and is now fully submitted.

## I.

### FACTUAL BACKGROUND

This tale of misplaced trust and resultant financial woe has been discussed in the Court's previous rulings on summary judgment motions [95][111]. It starts with a hunting trip to Iowa.

Bruce Tripp has lived in North Carolina all his life where he is a practicing dentist. He met defendant Timothy Lee in 1997 when Dr. Tripp was trying to find someone to lead him and his son on a hunting trip in Texas. A friend gave Mr. Lee's name to Dr. Tripp. At the time Mr. Lee also lived in North Carolina where his family had a farm business, A. H. Lee & Sons. They were not able to book a hunting trip in Texas and Mr. Lee suggested they could schedule a trip in Iowa. Dr. Tripp came to Iowa for a deer hunt with Mr. Lee, liked the area, and came back on several occasions to hunt. Mr. Lee proposed they start up a deer ranch facility in Iowa.

To assess Mr. Lee's character for the prospective business venture Dr. Tripp met with some of Mr. Lee's family who ran the family farm in North Carolina and with Mr. Lee's preacher but did little else to check on Mr. Lee's background.

Originally Dr. Tripp and Mr. Lee were going to try to lease some land in Iowa. Their plans changed when they found a farm they liked in Taylor County and approached the owner about purchasing it. The farm, the Hall farm of between 200 and 300 acres, was purchased by Dr. Tripp in May 1998. Dr. Tripp paid the $364,000 purchase price from his personal funds. Mr. Lee contributed nothing. Mr. Lee moved to Iowa to manage the farm. Dr. Tripp stayed in North Carolina.

Prior to purchasing the Hall farm Dr. Tripp and Mr. Lee established an Iowa limited liability company, LT Farm & Ranch, LLC. They used the services of Lenox, Iowa attorney Richard Wilson. LT's Articles of Organization were filed with the Iowa Secretary of State on April 29, 1998. (Def. Ex. A). They did not reveal much about the management and ownership of the company beyond the fact that its business would be governed by managers. (*Id.* at 2).

Dr. Tripp transferred the farm to LT. Initially, LT's Operating Agreement established Mr. Lee as its sole manager. (Pl. Ex. 3). The Operating Agreement gave him broad powers with few limitations. Borrowing money or purchasing assets required the consent of LT's two members, Mr. Lee and Dr. Tripp. (*Id.; see* Def. Ex. B at 19, App. A). The manager could not "perform any act which

would impair or make impossible the ordinary conduct of the [LLC's] business" or "sell all or substantially all of the assets of the [LLC] other than in the ordinary course of business." (Def. Ex. B at 9-10). In February 2000, at the suggestion of Dr. Tripp's North Carolina accountant, the Operating Agreement was amended to make Dr. Tripp and Mr. Lee co-managers. (*Id.* at 8, Ex. C).

Under the Operating Agreement, profits were to be split fifty-fifty between Mr. Lee and Dr. Tripp. All of the losses were allocated to Dr. Tripp up to the limit of his investment. (Def. Ex. B at 5). When LT needed money, Dr. Tripp would make a "loan" to the company. Dr. Tripp opened a bank account for LT at what became the Citizens Bank in Bedford, Taylor County, Iowa. He agreed to give Mr. Lee check-signing authority up to $10,000 on the account, although that limit was never put in writing. Mr. Lee, and his wife Debra, freely wrote checks on the account which were honored by the bank.

After purchasing the Hall farm, LT at Mr. Lee's prompting (as the Court understands) acquired two additional farms in Taylor County in April and May 1999. (*See* Pl. Ex. 17 (describing the farms and date of purchase)). Again, Dr. Tripp paid the purchase price. One of the things that made the two farms attractive was that some or all of the farm ground was enrolled in the CRP administered by

the Commodity Credit Corporation ("CCC"),[5] a federal corporation within the USDA, and consequently came with annual income.

Unknown to Dr. Tripp, in June and August 1999 Mr. Lee re-enrolled the two newly acquired farms in the CRP at USDA's Farm Service Agency office ("FSA") in Taylor County. The first, smaller farm with about 66 acres of eligible ground was enrolled in a single contract. (Pl. Exs. 5, 17 at 1). The other, larger farm with about 253 acres of eligible ground was enrolled in four contracts covering four parcels (about 28, 4, 214, and 7 acres). (Pl. Exs. 6-9, 17 at 2-3). The annual CRP payment on the first farm was $4,540 and for the second farm totaled $23,361. (*See* Pl. Ex. 17). Mr. Lee signed the CRP contracts for LT. Taylor County FSA Executive Director Jacque Lenhart signed for the CCC.

It was standard procedure for Ms. Lenhart to determine farm ownership and, in the case of an LLC, ascertain the organization's members and their authority. Mr. Lee completed a form CCC-502C to accomplish the latter. He listed himself as the only member and falsely claimed one hundred percent ownership of LT. (Pl. Ex. 1). Mr. Lee presented Ms. Lenhart with page 8 of the LT Operating Agreement which, at the time, correctly identified him

_____

[5] The CRP makes annual rental payments to landowners for eligible crop land taken out of production and devoted to conservation purposes.

as the sole manager of the company. (Pl. Ex. 3). In reliance on these documents Ms. Lenhart approved the contracts.[6]

On July 12, 1999, at about the same time he was re-enrolling the new farm properties in the CRP program, Mr. Lee assigned the 1999 CRP payments on the two farms in the amount of $23,361 to his family's North Carolina farm operation, A. H. Lee & Son. (Pl. Ex. 22; *see* Pl. Ex. 17 at 2 (describing the pro rated amounts paid to A. H. Lee under the assignment)).[7] To accomplish the assignment Mr. Lee used USDA form CCC-36 and purported to act on behalf of LT.

Nelson Hogg is a resident of Lubbock, Texas. He had been involved in banking, primarily in agricultural lending, for many years. In 1984 he and a group of investors purchased the O'Donnell bank. Mr. Hogg was president and chairman of the bank board from 1985 to June of 2003.

Bobby Brown was a customer of the O'Donnell bank in the mortgage lending business. Mr. Brown bought and packaged mortgage loans for resale. Mr. Brown sold the O'Donnell bank on the idea of purchasing CRP payments from owners/producers. Using the federal Freedom of Information Act, Mr. Brown would obtain lists of CRP

---

[6] Ms. Lenhart signed the contracts in August and September 1999.

[7] It is not clear if only the CRP payment on the larger farm was assigned, or both, but the CCC appears to have paid the assignment on both farms as shown on Plaintiff's Exhibit 17.

enrolled owners/producers to whom he then made mass mailings, soliciting purchase of their CRP payment stream. According to Mr. Hogg, Mr. Brown had his own company and was not an employee of the O'Donnell bank, though the Court notes he signed letters on bank letterhead as well as the disputed contracts as the "Agriculture Manager" of the bank. (*See* Pl. Exs. 19, 37, 38 at 17). The O'Donnell bank funded the purchases, of which there appear to have been hundreds (*see* Pl. Ex. 42 at 11-28), and owned the sales contracts. In purchasing CRP payments, the bank relied on the owner/producer, financial and other information gathered by the local FSAs. It did no independent investigation to verify the authority or status of the producer/seller. If the information was good enough for the FSA to pay money on, it was good enough for the O'Donnell bank to do likewise.

Apparently Mr. Lee became aware of the opportunity to sell CRP payments through one of Mr. Brown's mass mailings. In December 2000 and April 2001 on behalf of LT, Mr. Lee entered into two Purchase and Assignment agreements ("the CRP sales contracts" or "sales contracts") with the O'Donnell bank, Contract Nos. 146630 and 244881. By the contracts Mr. Lee sold LT's rights to future CRP payments on the two farms purchased in 1999 in the total amount of $112,444 for lump sum payments totaling $67,615.[8] As part of the

---

[8] The sales contracts and assignments did not concern the first farm, the Hall farm, purchased in 1998.

transaction Mr. Lee assigned to the bank future CRP payments on the farms totaling $173,821, representing most, but not all, of the CRP entitlement for the farms. To understand the transactions requires further explanation with a focus on the assignments (Pl. Exs. 10, 12), the purchase price and sale provisions in the sales contracts, (Pl. Exs. 37, 38 at 2),[9] and the bank's "quote" to LT which described how the overall deal would work. (*Id.* at 18).

For the lump sum purchase price recited in the sales contracts the O'Donnell bank acquired the right to receive a portion of LT's annual CRP payments for a number of years (the payment period), six years (2001-2006) in the case of the first contract relating to the larger farm (146630) and five years (2001-2005) in the case of the second contract (244881) relating principally to the smaller farm. (Pl. Exs. 37, 38 ¶ 1.1 at 2). Evidently as a form of security LT was required to assign annual CRP payments beyond the six- and five-year payment periods. With respect to the first sales contract LT assigned $19,643[10] of seven annual CRP payments (2001-2007) totaling $137,501, and with respect to the second contract LT assigned eight annual $4,540 CRP payments

---

[9] Other than the amounts involved the sales contracts are identical. A citation to the contracts with a page or paragraph number refers to the page or paragraph in both contracts.

[10] The total annual CRP amount for the four parcels of the larger farm was $23,361. (*See* Pl. Ex. 17 at 2-3).

(2001-2008) totaling $36,320.[11] (Pl. Exs. 10, 12). Under what was referred to in the evidence as a "kickback" provision in paragraph 1.2 of the sales contracts, the bank was, within thirty days after the receipt of each CRP payment from the USDA, required to "remit to [LT] the portion of each CRP payment . . . which exceeds the amount of such payment acquired by [the bank] under this agreement." The bank only purchased eighty percent of the annual assigned CRP payments during the payment periods and consequently under the kickback provision was required to annually remit to LT twenty percent of each payment. (Pl. Exs. 37, 38 at 18). This twenty percent kickback feature was to provide the owner/producer with enough money to pay property taxes and maintain the property as required to qualify for continued CRP payments. At the end of the six- and five-year payment periods any additional assigned CRP payments would exceed what the bank had purchased. Under the kickback provision LT was then entitled to remittance of the additional assigned CRP payments. (*Id.*)

---

[11] While the second assignment purports to be through 2008 for $36,320, the smaller farm was only enrolled in CRP through 2006 and the larger farm through 2007. Though the USDA would have applied any additional CRP payments LT was entitled to receive in the last year (2007) to both assignments, the assignments still totaled slightly more than the amount available to assign. (*See* Pl. Exs. 5, 17-18). The math is not entirely accurate, but for simplicity the Court has accepted that LT's CRP entitlement would have funded the entire amount of the assignments. The discrepancy is not material to the outcome.

In the first sales contract the O'Donnell bank purchased $15,714 (80%) of an annual $19,643 CRP payment for a period of six years, a total of $94,284. The lump sum purchase price paid by the bank was $56,126. LT assigned the annual $19,643 CRP payments to the bank for a period of seven years totaling $137,501. When the bank received each annual $19,643 CRP payment it was to return twenty percent to LT, $3,929, leaving the bank with the contracted-for annual periodic payment of $15,714. The twenty percent kickback amount over the six-year period totaled $23,574. At the end of the six year payment period LT would have been entitled to the seventh and last year of the assignment. Putting all this together, a $94,284 CRP entitlement was sold and $137,501 assigned. LT received (or was entitled to receive) the lump sum payment of $56,126, the twenty percent annual kickback totaling $23,574 over six years, and the seventh year $19,643 CRP payment, a total of $99,343. (*See* Pl. Ex. 37 at 18).

In the second sales contract the O'Donnell bank purchased $3,632 (80%) of an annual $4,540 CRP payment for a period of five years, a total of $18,160. The lump sum purchase price paid by the bank was $11,489. LT assigned $4,540 in annual CRP payments to the bank for a period of eight years (*but see* n. 11 *supra*), totaling $36,320. When the bank received each annual $4,540 CRP payment, it was to return twenty percent to LT, $908, leaving the bank with the contracted-for annual periodic payment of $3,632. The twenty

percent kickback amount over the five-year period totaled $4,540.
At the end of the five-year payment period LT would have been
entitled to remittance of the remaining amount of the assignment,
$13,620.[12] Thus, an $18,160 CRP entitlement was sold and $36,320
assigned. LT received (or was entitled to receive) the lump sum
payment of $11,489, the twenty percent annual kickback totaling
$4,540 over five years, and the amount of the assignment beyond the
five years purchased, $13,620, for a total of $29,649. (*See* Pl. Ex.
38 at 18).

On the two contracts LT assigned $173,821 in CRP payments
for which it was paid, had kickbacked, or was entitled to return at
the back end $128,992. Again, the total amount of the CRP payments
purchased by the bank was $112,444.

The contracts were freely assignable by the O'Donnell
bank and any subsequent assignee without notice to or the consent
of LT. LT promised "upon request of Purchaser or any assignee of
Purchaser" that it would "execute and deliver any such documents as
Purchaser or any such assignee may require to effectuate and
consummate the transactions contemplated hereby." (Pl. Exs. 37, 38
at 15-16). The assignments were made on USDA form CCC-36 and

---

[12] The quote for the second sales contract is in error in
showing that after the bank received all of the purchased payments
over five years, only the equivalent of one year of excess CRP
assignment was to be remitted. (*See* Pl. Ex. 38 at 18). While only
one year of CRP eligibility remained at the end of five years on
the smaller farm, the total assignment of $36,320 was calculated on
the basis of $4,540 for eight years.

executed by Mr. Lee on behalf of LT as assignor and Mr. Brown for the O'Donnell bank as assignee. (Pl. Exs. 10, 12). The form CCC-36 included a "special provision" as follows: "This assignment does not extend to any successor of the assignee, nor may the assignee re-assign this contract." (Pl. Exs. 10 at 2, 12 at 2).[13]

Dr. Tripp thought the farms purchased in 1999 were already enrolled in CRP. He did not know about the re-enrollment, but he expected the property would continue in CRP. Dr. Tripp knew nothing about Mr. Lee's sale of a portion of the CRP payments to the O'Donnell bank. Dr. Tripp was also unaware of the fact that Mr. Lee had obtained a $150,000 mortgage on the Hall farm purchased by Dr. Tripp in 1998.

The lump sum payments from the O'Donnell bank were wired to LT's account at the Citizens Bank in Bedford, Iowa. (Def. Ex. E at 26, 46). It is difficult to trace in detail what happened to the money, but before and after the contracts with the O'Donnell bank Mr. Lee and his wife Debra wrote many checks on LT's account for cash and what appear to be their personal expenses.(*See generally* Def. Ex. E). Money was also sent to Mr. Lee's North Carolina farm operation, A. H. Lee & Son, and at least one other family member.

---

[13] The effect of this assignment limitation was discussed at length in the June 4, 2010 summary judgment ruling [95]. The Court held: "The anti-assignment provision in the CCC-36 form limits only the right of Farm & Ranch or TIB to receive CRP payments directly from the government. It does not invalidate or interfere with the assignments and related undertakings of the underlying contracts." (*Id.* at 11).

Checks were also written to service the mortgage on the Hall farm. It is a fair inference from the record that as with other receipts (some of the farm ground not in CRP was rented out), little if any of the purchase price paid by the O'Donnell bank went to benefit LT and, in fact, most was taken by Mr. Lee.

As noted previously, not all of the CRP money on the second, larger farm purchased in 1999 was assigned to the bank. The additional amount, $3,718,[14] was deposited in LT's Bedford, Iowa account in 2001. In October 2002 Mr. Lee gave direct deposit instructions to the Taylor County FSA that future CRP payments were to be deposited in the personal account of Mr. Lee and his wife at the Wachovia bank in Bayboro, North Carolina. The $3,718 annual amount of unassigned CRP payments was deposited in that account in 2002 and 2003. (Pl. Exs. 17, 25; Def. Ex. F at 2, 4).

Dr. Tripp did not know much about LT's financial condition and did little to inform himself. He trusted Mr. Lee. Dr. Tripp did not know what the CRP payments were. Other than the loans he had made to LT, he did not know what money was going into or coming out of LT. His accountant in North Carolina received LT's bank statements until sometime in 2000, after which neither the accountant nor Dr. Tripp received statements. Mr. Lee explained to Dr. Tripp that his accountant in Iowa was doing LT's books so it was not necessary for Dr. Tripp's accountant or Dr. Tripp to

---

[14] *See* n.10 *supra*.

receive bank statements. Dr. Tripp did not ask the bank to send statements to him. Mr. Lee did not give Dr. Tripp any financial reports and Dr. Tripp seems not to have asked Mr. Lee for financial information. Mr. Lee told Dr. Tripp that LT filed tax returns, but Dr. Tripp was not shown the returns nor did he ask for them. As Mr. Lee was taking LT's money, Dr. Tripp continued to "loan" money to LT at Mr. Lee's request.

Mr. Hogg experienced difficulties with the Comptroller of the Currency concerning his management of the O'Donnell bank as a result of which he was compelled to resign in June 2003 and sell his interest in the bank. (*See* Def. Ex. J). In December 2003 the O'Donnell bank was sold and merged into the State National Bank of Big Spring. (Def. Ex. H). Before it was sold, the O'Donnell bank had received $72,549 from the USDA under LT's CRP assignments, a figure which does not reflect the twenty percent kickback amounts. (*See* Pl. Ex. 17).

In the process of selling the O'Donnell bank, Mr. Hogg formed a limited partnership, First National AG Services, Ltd., whose general partner was FNAS Management LLC, another entity created by Mr. Hogg. First National AG Services later changed its name to Farm & Ranch Services, Ltd., the original plaintiff. (Pl. Ex. 39 at 11; *see* Complaint [35-2] ¶ 1). When he severed his relationship with the O'Donnell bank Mr. Hogg retained an option to purchase the CRP sales contracts held by the bank.

In October 2003 Dr. Tripp first discovered problems with the management of LT after a farm tenant, Richard Grady, contacted him wondering where to send a rent check. Dr. Tripp initiated inquiries which led him to contact the Taylor County FSA office. He discovered Mr. Lee had assigned most of the CRP payments to the O'Donnell bank and AH Lee & Son. Dr. Tripp notified the Taylor County FSA office that he had not authorized the assignments. In November 2003 Dr. Tripp contacted the O'Donnell bank, speaking to a Dennis Wilson. He says he advised Mr. Wilson that Mr. Lee did not have authority to assign the contracts. Dr. Tripp disputed the assignments and wanted his money back. Dr. Tripp advised his Iowa attorney, Mr. Richard Wilson, of all of this and Mr. Wilson undertook an investigation. (*See* Def. Ex. G). On April 16, 2004 Mr. Wilson wrote to Mr. Lee who by that time had abandoned LT's farms to return to North Carolina. In his letter Mr. Wilson summarized Mr. Lee's misdeeds, notified him of Dr. Tripp's intent to dissolve the LLC, and invited Mr. Lee to work with them in resolving "outstanding debts." (Def. Ex. P). Mr. Lee did not respond to the letter.

Farm & Ranch exercised its option to purchase the O'Donnell bank's numerous CRP sales contracts now held by the Big Spring bank, including the LT contracts. The LT contracts were purchased on May 13, 2004 for $44,553.36. (Pl. Exs. 42 at 1, 19, 43).

On November 2, 2004, the FSA sent a letter to Mr. Lee, Dr. Tripp and the O'Donnell bank stating no further CRP payments would be made until a signature discrepancy on its records was resolved. Mr. Lee apparently had forged Dr. Tripp's signature on a "Designation of Permitted Entities" form filed with the FSA on November 1, 2002. (Pl. Exs. 17, 30). The USDA has accumulated all of LT's CRP payments from 2004 through 2007. At trial USDA Agricultural Program Specialist Jim Book, whose duties include oversight of the administration of the CRP by the Taylor County FSA office, testified the amount currently being held is $105,265. (*See also* Pl. Ex. 18; Def. Ex. L).[15]

The acquisition of the CRP sales contracts from the Big Spring bank was a large transaction. To finance the purchase Farm & Ranch borrowed approximately $6.5 million from The Texas Independent Bankersbank ("TIB"). (Pl. Ex. 45). The loan was collateralized by the contracts. (*Id.* at 2). In December 2009 Farm & Ranch assigned to TIB its rights to the CRP payments under the disputed sales contracts and its claims in this lawsuit. (Pl. Ex. 49). As noted previously, the USDA form CCC-36 used to assign LT's CRP payments to the O'Donnell bank states the USDA does not honor reassignments of CRP payments by an assignee, nor does it recognize

---

[15] Plaintiff objected to receipt of Exhibit L, Mr. Book's affidavit, on hearsay grounds. The exhibit was received subject to the objection. The objection is well taken, but Plaintiff's Exhibit 18 shows the same amount has been held back by the USDA.

any right of a successor of the original assignee to the payments. The USDA has previously informed the Court, and in part Mr. Book testified to the same effect, that it now views the assignment as invalid resulting in the right to the retained payments reverting to LT, though the USDA would likely honor a new assignment to Farm & Ranch or TIB. (*See* Summary Judgment Ruling [95] at 11). LT has refused to execute a new form CCC-36 assignment in favor of TIB.

**II.**

**DISCUSSION AND ULTIMATE FINDINGS**

**A.   Choice of Law and Plaintiff's Claims**

   1.   <u>Choice of Law</u>

The remaining claims against LT succeeded to by TIB are breach of contract, quantum meruit, promissory estoppel and fraud.[16] TIB also seeks a declaratory judgment entitling it to the withheld CRP money and an order requiring the USDA to pay it to TIB.

The CRP sales contracts provide they shall be governed by the laws of Texas (Pl. Exs. 37, 38, ¶ 7.2 at 13). In their trial briefs, however, the parties have relied exclusively on Iowa case and statutory authority. Neither side has established what the relevant law of Texas is.

---

[16] TIB has abandoned the tortious interference with contract claim against LT in recognition of the fact a party cannot interfere with its own contract.

As discussed below, the primary contract issue on liability is the validity of the CRP sales contracts entered into by Mr. Lee on behalf of LT, an issue which has to do with Mr. Lee's authority to act for LT. The choice of law provision in the contracts is not binding if there was no valid contract. Iowa law governs the determination of the validity and existence of the contracts. *See John T. Jones Const. Co. v. Hoot General Const.*, 613 F.3d 778, 782-83 (8th Cir. 2010). Federal courts sitting in diversity cases apply the conflict of law rules of the forum state. *Id.* at 782. Iowa applies the most significant relationship test. *Id.* at 783. The transaction here involved the purchase of CRP payments by a Texas bank from an Iowa LLC. Iowa farms generated the payments, and the CRP contracts with the CCC were entered into in Iowa. LT's performance was to be in Iowa. The issue concerns Mr. Lee's authority under Iowa corporation law. In these circumstances Iowa would seem to have the most significant relationship to the formation of the contract.

Beyond this, Iowa choice of law rules require that the proponent of foreign law establish what it is, otherwise the Court may presume the foreign law is the same as Iowa's. *Pennsylvania Life Ins. Co. v. Simoni*, 641 N.W.2d 807, 810-11 (Iowa 2002). The Court has not been referred to applicable Texas law. Accordingly, the Court will, as the parties have done, look to Iowa law for resolution of the issues in this case.

2.  <u>Breach of Contract</u>

TIB alleges LT breached the CRP sales contracts it entered into with the O'Donnell bank by causing the cessation of the periodic payments purchased by the bank and failing to execute documents which would allow the O'Donnell bank, and now by assignment, TIB to continue to receive the CRP payments.

Under Iowa law, a party claiming breach of contract must establish

> (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Kern v. Palmer College of Chiropractic,* 757 N.W.2d 651, 657-58 (Iowa 2008(quoting *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998)).

The first element, existence of a valid contract, is the disputed issue here. All of the other elements are established. The terms and conditions of the contracts are set out in writing. The O'Donnell bank performed; it paid the purchase price. LT breached the contract. It promised to make periodic payments through assignment of its CRP payments and upon the request of any assignee of the O'Donnell bank to "execute and deliver such documents as Purchaser or any such assignee may require to effectuate the payments." (Pl. Ex. 37, 38, ¶ 7.101 at 16). By the actions of Dr.

Tripp, LT has caused the cessation of the periodic payments purchased by the O'Donnell bank and assigned, ultimately, to TIB. LT has refused to make the payments or execute another form CCC-36 assignment so that TIB may receive the CRP payments as agreed. TIB has suffered damages, the promised periodic payments have not been received.

a.   Actual and Apparent Authority of Mr. Lee

Tim Lee executed the sales contracts with the O'Donnell bank on behalf of LT. TIB argues Mr. Lee as LT's manager had actual and apparent authority to enter into the contracts, and LT ratified the contracts by its acceptance of consideration, subsequent silence, and performance until late 2003. LT disputes Mr. Lee's authority and raises a number of issues going to the validity and enforcement of the contracts.

An agency relationship may be shown by the agent's actual or apparent authority to act for the principal. *Frontier Leasing Corp. v. Links Eng'g, LLC*, 781 N.W.2d 772, 776 (Iowa 2010). TIB has the burden of proof on the issue. *Id.* It is undisputed that Mr. Lee was an agent of LT as its manager, from inception until February 2000 as its sole manager, and thereafter as co-manager with Dr. Tripp. As such Mr. Lee had actual authority conferred by LT as principal in its written Operating Agreement to act as its agent subject to the express instructions and limitations in the agreement.[17] *See* Iowa Code § 490A.702(3)(b)(2009)[18](unless otherwise

_____

[17] Under the terms of LT's Operating Agreement the manager was vested with "the exclusive right to act" for LT in its day-to-day activities including the authority to execute contracts for LT. (Def. Ex. B at 8, 9).

[18] All citations in this ruling to Iowa Code chapter 490A are
(continued...)

provided in the articles of organization or an operating agreement
"[e]very manager is an agent of the limited liability company for the
purpose of its business and affairs. . . ."; *Hendricks v. Great Plains
Supply Co.*, 609 N.W.2d 486, 493 (Iowa 2000)(generally discussing the
creation of actual authority)). Actual authority may also be implied by
the circumstances. *Hendricks*, 609 N.W.2d at 493.

As LT's manager Mr. Lee also had apparent authority. "Apparent
authority is authority the principal has knowingly permitted or held the
agent out as possessing." *Frontier Leasing Corp.,* 781 N.W.2d at 776
(citing *Magnusson Agency v. Pub. Entity Nat'l Co.-Midwest*, 560 N.W.2d 20,
25-26 (Iowa 1997)). By the operating agreement LT knowingly permitted Mr.
Lee to act as the manager of its farms and held Mr. Lee out as possessing
the ordinary authority of a farm manager.

In the case of the manager of a limited liability company, the
Iowa Limited Liability Company Act (the "LLC Act"), Iowa Code ch. 490A,
has something to say about apparent authority. As noted above, under §
702 of the LLC Act Mr. Lee as manager was an agent of LT. The same
section conferred apparent authority on Mr. Lee to conduct LT's business
and outlined the extent to which third parties could rely on his
authority.

---

[18](...continued)
to the 2009 Iowa Code, the relevant portions of which were in
effect at the time of the events in issue. Chapter 490A was
repealed effective December 31, 2010. Iowa Code § 490A.1701. It was
replaced by a "Revised Uniform Limited Liability Company Act" based
on the Revised Uniform Limited Liability Company Act (2006)
promulgated by the American Law Institute, now codified at Iowa
Code § 489.101, *et seq.* The Revised Act "does not affect an action
commenced, proceedings brought or right accrued before" its
effective date. Iowa Code § 489.1303.

> . . . The act of any manager with agency authority,
> including, but not limited to, the execution in the
> name of the limited liability company of any
> instrument, *for apparently carrying on in the
> ordinary course of the business or affairs of the
> limited liability company* shall bind the limited
> liability company, unless the manager so acting
> has, in fact, no authority to act for the limited
> liability company in the particular matter, and the
> person with whom the manager is dealing has
> knowledge of the fact that the manager has no such
> authority.

Iowa Code § 490A.702(3)(b)(emphasis added). "An act of a manager or member in contravention of a restriction on authority shall not bind the limited liability company to persons having knowledge of the restriction." *Id*. § 490A.702(7). These provisions are consistent with general principles of apparent authority in agency law. *See Restatement (Third) of Agency* § 2.03 (2006)("*Restatement*"). As a consequence, notwithstanding any restriction of authority in an operating agreement or otherwise, an LLC manager has apparent authority on which other persons may rely to act for the LLC on matters which would be considered in the ordinary course of the LLC's business unless the person has actual knowledge that the manager does not have the authority to act in the matter. Where ordinary business transactions are concerned, the third party dealing with an LLC does not have to verify the manager's authority and is not charged with knowledge of limitations in the organizational documents. *See Restatement* § 2.03 cmt. d at 119 ("Absent circumstances that should raise questions in the mind of a reasonable third party, as a general matter there is no requirement that the third party inquire into the scope of an agent's authority.") Were it otherwise, third parties would be reluctant to deal with an LLC. Indeed, in a 2000 amendment to section 702 effective before the contracts with the

O'Donnell bank were entered into the Iowa legislature repealed a provision which charged a person with knowledge of provisions in the articles of organization limiting the agency authority of a manager. Iowa Acts 2000 (78 G.A.) ch. 1041, § 1 (repealing Iowa Code § 490A.702(8)).

This principle of an LLC manager's apparent authority appears to have been carried forward in the Revised Uniform Limited Liability Company Act now largely in effect in Iowa (*see* n. 18 *supra*). The comments to the Act note that "courts may view the position [of an LLC manager] as clothing its occupants with the apparent authority to take actions that reasonably appear within the ordinary course of the company's business." Unif. Ltd. Liability Co. Act 2006 § 407 cmt. subsec. (c). The nature of the LLC's business is "relevant to whether a third party could reasonably believe that a [manager] is authorized to commit the organization to a particular transaction." *Id.* (quoting *Restatement* § 3.03 cmt. d).

Mr. Lee, sole manager at the time, clearly had the authority to re-enroll the two 1999 farms in CRP. Though he knew nothing of the details, the enrollment in CRP was one of the things that made acquisition of the farms attractive and Dr. Tripp assumed they would remain in the program. The question is Mr. Lee's authority to later sell a substantial part of the two farms' CRP entitlement to the O'Donnell bank by which time he was a co-manager with Dr. Tripp. Mr. Lee did not have actual authority to act alone in entering into the CRP sales contracts with the bank. Iowa law at the time provided that if an LLC had more than one manager "all decisions of the manager shall be by majority vote of the managers." Iowa Code § 490A.705(7). Dr. Tripp was not consulted. The O'Donnell bank did not know Mr. Lee lacked authority. The

determinative factor on Mr. Lee's apparent authority to enter into the sales contracts is whether one in the O'Donnell bank's position could reasonably believe that as manager of the farms which he had enrolled in CRP on behalf of LT Mr. Lee had authority to sell future CRP payments in order to generate immediate cash. The Court concludes the O'Donnell bank could reasonably have believed Mr. Lee had this authority.

The future right to payments under a CRP contract with the government is an asset. It may be pledged or sold to generate money to support farm operations. "Government entitlements, such as [Conservation Reserve Program] payments may, in many cases, be the only unencumbered asset a farmer may have available to pledge as security." *AG Acceptance Corp. v. Nelson*, 103 F. Supp. 2d 1129, 1134 (D. Minn. 2000)(quoting *In re Arithson*, 175 B.R. 313, 321 (Bankr. D.N.D. 1994)(bracketed language original to *Nelson* court)); *see In re Sunberg*, 729 F.2d 561, 562 (8th Cir. 1984); *Lisbon Bank & Trust Co. v. Commodity Credit Corp.*, 679 F. Supp. 903, 907 (N.D. Iowa 1987)(both cases noting the importance of federal farm programs in financing farm operations). Knowing Mr. Lee had on LT's behalf contracted with the CCC to receive CRP payments, one in the O'Donnell bank's position could reasonably believe that in the ordinary course of managing LT's farm business Mr. Lee could convert the CRP entitlement into immediate funds to finance farm operations. The transaction was not in itself so extraordinary as to reasonably call Mr. Lee's apparent authority into question.

Had Mr. Lee applied the money paid to LT by the O'Donnell bank to LT's benefit by, for example, improving the property so as to be attractive for deer hunting, or for ordinary farm purposes, it is unlikely Dr. Tripp could or would have complained about the validity of

the CRP sales contracts. The eye-catching feature of this case is that Mr. Lee took the money paid to LT by the O'Donnell bank and defrauded Dr. Tripp, not that he entered into the contracts to obtain funds ostensibly for LT.

    b.    Ratification

    Regardless of Mr. Lee's actual or apparent authority to enter into the sales contracts with the O'Donnell bank, the Court agrees with TIB that in the circumstances LT ratified the contracts.

> The acceptance by a corporation of the benefits of the acts of one of its officers or employees knowingly, whether authorized to act for it or not, amounts to an affirmance or ratification of his acts.

*Mayrath Co. v. Helgeson*, 258 Iowa 543, 551, 139 N.W.2d 303, 308 (1966); *see Frontier Leasing*, 781 N.W.2d at 777 ("[A] principal may be liable when he knowingly accepts the benefits of a transaction entered into by one of his agents." (citing *Mayrath*); *Ellwood v. Mid States Commodities, Inc.*, 404 N.W.2d 174, 179 (Iowa 1987)(stating elements of ratification). The same rule would apply to the acceptance by a limited liability company of the benefits of the acts of one of its managers.

    LT accepted the benefit of Mr. Lee's acts, the price paid for the sales contracts, though Mr. Lee would later take the money. LT performed by making the assignments. No objection was raised during the course of three years of CRP payments. Mr. Lee had full knowledge of the transaction and of LT's acceptance of the benefits of the contracts.

    Ordinarily, knowledge of the agent is imputed to the principal. Here Mr. Lee was acting adversely to LT's interests in the transactions as they were evidently part of a scheme to defraud LT and Dr. Tripp. In this circumstance Mr. Lee's knowledge is not imputed to LT

27

unless "necessary to protect the rights of a third party who dealt with the principal in good faith." *Restatement* § 5.04. The O'Donnell bank acted in good faith. It paid a not insignificant sum of money for the right to receive a portion of LT's future CRP payments. Imputation to LT of knowledge of the transactions is necessary to protect the bank's interest, and now that of assignee TIB, in the consideration it was to receive under the contracts. Mr. Lee's knowledge of the transaction, including LT's acceptance of the money paid by the bank, is therefore imputed to LT and as a consequence its knowing acceptance of the purchase price ratified the contracts.

Overall the agency rules discussed above assign to the principal the risk that in dealing with third parties an agent will act in excess of his authority or adverse to the principal unless it is unreasonable for the third party to accept the agent's authority or the third party has reason to suspect the agent's self-dealing. That LT and Dr. Tripp should bear the consequences of Mr. Lee's conduct is entirely appropriate in the circumstances of this case. Dr. Tripp placed Mr. Lee in a position where he could defraud LT as well as Dr. Tripp. Though later a co-manager with Mr. Lee, Dr. Tripp abdicated the management of the company to Mr. Lee. Dr. Tripp did not take the most elemental precautions to assure himself that LT was being appropriately managed, its funds properly accounted for and spent solely for the benefit of LT. In the process he breached his own fiduciary responsibility to LT as a manager "for the safekeeping and use of all funds and assets of [LT]" and failed in his duty as manager not to "permit others to employ such funds or assets. . . in any manner except for the benefit of [LT] . . . ." (Def. Ex. B ¶ 6.04(f) at 10). Dr. Tripp's failure to perform his duties

to LT signaled to Mr. Lee that he would not be held accountable and can only have encouraged his malfeasance.

      c.    LT's Arguments

The Court has carefully considered LT's arguments against the validity and enforcement of the sales contracts but finds them unconvincing.

LT contends the O'Donnell bank knew or should have known that Mr. Lee did not have authority to enter into the sales contracts. It argues that because the articles of organization filed with the Secretary of State were uninformative the bank should have investigated Mr. Lee's authority because if it turned out there was more than one manager in light of Iowa Code § 490A.705(7) the bank would have known Mr. Lee could not act alone. LT views the statute as notice that there might be more than one manager. As indicated previously, the bank did not have a duty to investigate Mr. Lee's actual authority and, in the absence of actual knowledge to the contrary, could rely on Mr. Lee's apparent authority to enter into contracts for LT in the ordinary course of LT's business.

LT argues that "selling $173,821 of company income for only $67,615 impaired the ordinary conduct of the LLC's business" and amounted to a breach of fiduciary duty by Mr. Lee in violation of section 6.03(d) and 6.04(f) of the Operating Agreement (LT Trial Brief [113] at 11). This characterization is not factually accurate. LT did not permanently relinquish the entire amount of the CRP payments it assigned. It assigned $173,821 but the bank only purchased $112,444 of the future CRP entitlement. The remainder of the assigned CRP payments would have been returned to LT in the annual "kickbacks" and at the end of the periodic payment period. Counting the lump sums, LT would in the end have received

$128,992 of the CRP entitlement, and in addition, the benefit of immediate cash. Seen in this light, the transactions, had the money paid by the O'Donnell bank been properly applied, would not have impaired the conduct of LT's business or been so disadvantageous as to amount to a breach of fiduciary duty. In any event the issue vis-a-vis the O'Donnell bank is not whether Mr. Lee acted in violation of the Operating Agreement, but whether the circumstances should have caused the bank to question his authority.

LT asserts that Farm & Ranch (and by extension TIB) assumed the risk the sales contracts with the O'Donnell bank would not be honored when it purchased the contracts in 2004 after Dr. Tripp had telephonically alerted the bank in November 2003 to his claim that the contracts were unauthorized. In a sense Farm & Ranch did assume the risk the contracts might be found invalid in that as assignee it stood in the shoes of the O'Donnell bank. If the contract was invalid as to the O'Donnell bank, it was invalid as to Farm & Ranch. However, the Court has found Mr. Lee had apparent authority to enter into the contracts on behalf of LT. The mere fact Dr. Tripp gave notice of his contention that the contracts were not valid does not mean that they are unenforceable by Farm & Ranch or TIB as assignees.[19]

_____

[19] LT notes that on December 19, 2003 after its merger with the Big Spring bank the O'Donnell bank ceased to exist, the USDA was not notified of this fact, yet CRP payments on the CRP sales contracts of other owners/producers payable to the O'Donnell bank continued to be received from the USDA and endorsed by the Big Spring bank and later Farm & Ranch. Since as between Farm & Ranch and the owners/producers Farm & Ranch had a right to the payments, the Court fails to see how the facts Farm & Ranch endorsed checks payable to the O'Donnell bank and the USDA's lack of notice of the merger affects the contract rights between the parties in this case.

3.    TIB's Other Claims

TIB's other claims, quantum meruit, promissory estoppel and fraud, may be quickly disposed of. The Court has found a valid express contract governs the dispute between TIB and LT. Quantum meruit is sometimes described as a theory of implied contract. Promissory estoppel is a quasi-contract doctrine which will, in some circumstances, enforce a non-contractual promise. Neither remedy is available where there is an express contract. *See Scott v. Grinnell Mut. Reinsurance Co.*, 653 N.W.2d 556, 562 (Iowa 2002)("'[t]he law will not imply a contract where there is an express contract.'" (quoting *Giese Constr. Co. v. Randa*, 524 N.W.2d 427, 431 (Iowa App. 1994))); 28 Am. Jur. 2d *Estoppel and Waiver* § 57 at 484-85 ("Once it is established . . . that there is in fact an enforceable contract between the parties, and therefore consideration exists, then a party may no longer recover under the theory of promissory estoppel.")

The representation alleged to support TIB's fraud claim against LT is "a false promise of future performance," namely that LT would sign over to the O'Donnell bank LT's interest in the CRP payments to the extent purchased by the bank. (Pl. Brief [114] at 10). For LT's promise to sign over the CRP payments to be fraudulent, TIB must prove by the preponderance of the clear, satisfactory and convincing evidence that LT knew the representation was false when made, in other words, that at the time LT made the statement, it had an existing intent to deceive. *See Van Sickle Const. Co. v. Wachovia Commercial Mortgage, Inc.*, 783 N.W.2d 684, 688 (Iowa 2010); *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 233 (Iowa 2004). The fact that LT made the required assignments is against any finding that it did not intend to perform at the time the promise of

future performance was made. The payments were interrupted only when Dr. Tripp discovered Mr. Lee's misconduct. There is no evidence Dr. Tripp made any misrepresentations of future performance. No actionable representation was made which would support the fraud claim against LT.

**B.  LT's Counterclaims**

In its counterclaims ([37] at 8-11) LT sought a declaration that the sales contracts were void and unenforceable under the Iowa LLC Act because the O'Donnell bank did not investigate Mr. Lee's authority, and, alternatively, rescission of the sales contracts. The Court's findings above on TIB's contract claim preclude the declaratory relief sought.

LT bases its rescission claim on Mr. Lee's misrepresentation that he had authority to enter into the sales contracts. (Def. Brief [113] at 14). Mr. Lee did indeed misrepresent his authority to the O'Donnell bank, but the difficulty with the rescission claim is that LT was not the party induced by the misrepresentation to enter into the contracts.

> When a party claims that he has been induced to enter into a contract *based on the other contracting party's misrepresentation*, he may seek to avoid the contract by suing for rescission using the misrepresentation as a basis for the requested relief.

*Hyler v. Garner*, 548 N.W.2d 864, 870 (Iowa 1996)(emphasis added). The elements of rescission based on a fraudulent misrepresentation are:

> (1) a representation, (2) falsity, (3) materiality, (4) an intent to induce *the other* to act or refrain from acting, and (5) justifiable reliance.

*Rubes v. Mega Life & Health Ins. Co., Inc.*, 642 N.W.2d 263, 269 (Iowa 2002)(quoting *Hyler*, 548 N.W.2d at 872)(emphasis added); *see Gouge v.*

*McNamara*, 586 N.W.2d 710, 713-14 (Iowa App. 1998). As the Iowa Supreme Court's articulation of the rescission principle and elements clearly indicates, rescission is not available to relieve LT from contracts procured by the misrepresentation of its agent to a third party. TIB, whose assignor may have been induced by Mr. Lee's misrepresentation of his authority, might be in a position to claim rescission, but it has elected to sue on the contracts. There is no claim that the O'Donnell bank made any misrepresentation to LT which LT relied on in entering into the sales contracts. It follows there is no basis to rescind the contracts.

## C.   TIB's Damages and Declaratory Relief Against LT

TIB seeks a judgment for all of the funds being held by USDA, sixteen percent (16%) per annum in pre-judgment interest, post-judgment interest, attorney fees and costs. It also requests declaratory judgment that it is entitled to the payments it seeks under the CRP contracts and an order requiring the USDA to pay TIB the CRP funds the USDA is holding. (Pl. Trial Brief at 11-12).

For cash payments the O'Donnell bank purchased periodic payments representing eighty percent of LT's assigned CRP entitlement during the payment periods specified in the sales contracts. TIB, as ultimate assignee, is entitled to "benefit of the bargain" damages which place it in "as good a position as [it] would have occupied had the contract been performed." *Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.*, 579 N.W.2d 823, 831 (Iowa 1998). Unpaid money due is the benefit of the bargain under a contract to make periodic payments. The contracts have a "liquidated damages" provision which stipulates that the purchaser's damages are benefit of the bargain damages (the total amount

33

of the unpaid periodic payments) plus an additional sum amounting to sixteen percent of the delinquent payments. (Pl. Exs. 37, 38 ¶ 6.4 at 12-13).

The total amount of the assigned CRP payments received by the O'Donnell bank before the USDA froze the payments was $72,549. This figure does not take into account the twenty percent kickback which should have been returned to LT annually. Beyond Mr. Hogg's testimony, there is no direct evidence the kickback payments were made. They are not identified in the partial (and therefore inconclusive) Citizens and Wachovia bank records in evidence. (Def. Exs. D, E, F). TIB has not produced the O'Donnell bank's records of kickback payments to LT. There is, however, circumstantial evidence the kickback payments were made.

The O'Donnell bank received the first CRP assignment payments in October 2001. (*See* Pl. Ex. 17). On November 13, 2001 Mr. Lee wrote a check on LT's Citizens Bank account payable to the O'Donnell bank in the amount of $3,632 which equals the 2001 periodic payment the O'Donnell bank was entitled to under the smaller sales contract. (Def. Ex. D at 15; *see* Pl. Ex. 38 at 18). Apparently Mr. Lee sent the check in error[20] as it appears not to have been paid. A "check reversal" entry in the same amount appears as a credit on the December 2001 Citizens Bank statement. (*Id.* at 13). This episode is probative of two things, first that Mr. Lee understood the twenty percent kickback arrangement and second that he would not have thought LT owed money to the O'Donnell bank unless he had

---

[20] The O'Donnell bank received the $4,540 2001 CRP payment on the smaller contract directly from the USDA (*See* Pl. Ex. 17 at 1).

received money from the O'Donnell bank which made him think the kickback had been inadvertently overpaid.

Independent of this, Mr. Lee was probably well aware the kickback payments should be coming annually because the kickbacks had been set out in the O'Donnell bank's quotes, and as he was taking the money for his personal expenses and those of his family's farm operation in North Carolina, receipt would have been important to him. He would surely have complained had the kickbacks not been paid. For its part, the O'Donnell bank had many similar sales contracts and in the ordinary course of its business would have set up a system to regularly make the kickback payments. It was in its interest to do so because the intent of the payments was to enable the owners/producers to pay taxes and maintain the property so that the CRP money would continue to flow from the USDA. Given Mr. Lee's knowledge and the mutual interest in assuring the kickback payments, the Court finds it is most probable that the annual kickback payments were in fact made.

Factoring in the twenty percent kickback amounts, the Court finds the net amount (*i.e.*, the CRP payments less the kickbacks) received by the O'Donnell bank was $58,039 (eighty percent of $72,549). Of the $112,444 in periodic payments conveyed to the bank in the contracts, $54,405 remained to be paid at the time the USDA froze the payments. All of the payments are now long past due. The contracted-for additional liquidated damages in the amount of sixteen percent of the unpaid periodic payment amount is $8,705 (sixteen percent of $54,405). The Court therefore finds that as a consequence of LT's breach of the sales contracts, TIB as ultimate assignee is entitled under the terms of the contracts to recover $63,110. Judgment will be entered for this amount.

As noted, TIB contends it is entitled to all of the post-2003 CRP payments being held by the USDA in the amount of $105,265 plus pre-judgment interest at 16% per annum. The assigned CRP funds held by the USDA exceed the total of the delinquent payments the O'Donnell bank was entitled to under the contracts. The Court can find no contract term which, upon LT's breach, forfeits LT's rights under the kickback provision to remittance of assigned CRP payments in excess of the periodic payments purchased by the bank. Judgment for the total of the delinquent periodic payments will provide TIB with all the O'Donnell bank was ever entitled to retain under the contracts.

There is also no provision in the contracts for sixteen percent pre-judgment interest. The liquidated damages provision includes a sixteen percent add-on above the delinquent periodic payments, but that is a lump sum.[21] TIB will receive pre-judgment interest at the rate provided in the Iowa Code and post-judgment interest as provided by federal law. 28 U.S.C. § 1961; Iowa Code §§ 535.3, 668.13.

The Court will not order the USDA to pay TIB the CRP money the USDA is holding. TIB is not entitled to all of the CRP money and the anti-assignment provision in the USDA's form CCC-36 makes TIB's downstream assignment unenforceable against the USDA. Both LT and TIB, however, have asked the Court to determine as between them which is entitled to the CRP funds held by the USDA. The Court will enter an appropriate declaratory judgment specifying the contract rights of LT and

---

[21] The sixteen percent add-on appears twice in the contracts, in paragraph 5.2 in connection with a cooperation clause and in paragraph 6.4, the liquidated damages provision. In neither case is the sixteen percent laid out as a pre-judgment interest rate.

TIB to the CRP funds. It should be understood, however, that the declaratory judgment is without prejudice to any right of execution against the USDA-held funds.

**D.    Default Damages Against Lee**

TIB abandoned its claim of tortious interference with contract against LT because a party cannot tortiously interfere with its own contract. Default has previously been entered against Mr. Lee on all of the claims against him including tortious interference. Taking the well-pleaded allegations of the Complaint against Mr. Lee as true, *see Murray v. Lene*, 595 F.3d 868, 871 (8th Cir.), *cert. denied*, 131 S. Ct. 255 (2010), as supplemented by the trial record, the Court believes the individual liability of Mr. Lee is best analyzed as one for tortious interference with the CRP sales contracts he negotiated with the O'Donnell bank.

The elements of the tort of intentional interference with contract are (1) plaintiff had a contract with a third person; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third person not to perform the contract; and (5) as a result plaintiff sustained damages. *Kern v. Palmer College of Chiropractic*, 757 N.W.2d 651, 662 (Iowa 2008); *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 763 (Iowa 1999). LT had the sales contracts with the O'Donnell bank. Having caused LT to enter into them, Mr. Lee had knowledge. Mr. Lee interfered with the contract by defrauding the other member of LT, Dr. Tripp, and taking the consideration paid by the O'Donnell bank for his personal use. In doing so Mr. Lee acted intentionally and improperly in breach of his fiduciary duties to LT. His misconduct, when discovered by

37

Dr. Tripp, caused LT to fail to perform the contracts. In the belief that the contracts were the product of fraud and entered into without authority, LT made claims which caused the USDA to stop CRP payments on the assignments. LT refused to make the remaining contracted-for periodic payments or execute assignments which would allow the CRP money held by the government to be paid to the O'Donnell bank's assignees. The amount of damage caused by Mr. Lee's interference is the same as the contract damages resulting from LT's failure to perform. Consequently, default judgment should be entered against Mr. Lee for $63,110, for which LT and Mr. Lee should be jointly and severally liable.

**E.    Attorney Fees**

The contracts provide for prevailing party attorney fees and expenses. (Pl. Exs. 37, 38 ¶ 7.8 at 15). As agreed with counsel at trial, any claim for attorney fees shall be made by post-judgment motion within the time and in the manner provided in Fed. R. Civ. P. 54(d)(2)(B), LR 54.1.a.

**III.**

**CONCLUSIONS OF LAW**

1.    TIB as assignee of Farm & Ranch has proved its claim of breach of contract against LT by a preponderance of the evidence and is entitled to recover as damages $63,110 (including liquidated damages). TIB has not proved any of its other claims against LT. Judgment, with pre- and post-judgment interest as discussed above, should be entered accordingly.

2.    A declaratory judgment should be entered declaring the rights of TIB and LT to the CRP funds being held by the USDA.

3.     Default judgment should be entered in favor of TIB and against Mr. Lee for tortious interference with contract in the amount of $63,110 plus pre- and post-judgment interest as discussed above.

4.     LT has not established any of its counterclaims and the same should be dismissed.

5.     No other claims, counterclaims or cross-claims have been proved in this case. The Complaint against USDA Secretary Vilsack should be dismissed.

## IV.

### ORDER FOR JUDGMENT

The Clerk shall enter judgment substantially as follows:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment is entered in favor of the Texas Independent Bankersbank and against LT Farm & Ranch, LLC for breach of contract, and default judgment against Timothy Allen Lee, jointly and severally, in the amount of $63,110 plus pre-judgment interest as provided by Iowa law and post-judgment interest as provided in 28 U.S.C. § 1961;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that of the assigned CRP funds being held by the United States Department of Agriculture, as between LT Farm & Ranch, LLC (LT) and the Texas Independent Bankersbank (TIB), TIB is contractually entitled to $63,110 and LT to the remainder;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all other claims against defendants are dismissed including specifically all claims against Tom Vilsack, Secretary of the United States Department of Agriculture;

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the counterclaims of LT Farm & Ranch, LLC are dismissed.

Attorney fee and expense claims may be submitted as provided above.

IT IS SO ORDERED.

Dated this 10th day of March, 2011.

_____
ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE